**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>　　　　　Petitioner,<br><br>v.<br><br>CHARLES CHAMP,<br><br>　　　　　Respondent. | No. 1:10-mc-27 |
| RODRIGO PEREZ PALLARES; and<br>RICARDO REIS VEIGA,<br><br>　　　　　Petitioners,<br><br>v.<br><br>CHARLES CHAMP,<br><br>　　　　　Respondent. | No. 1:10-mc-28 |

**CHEVRON CORPORATION'S OPPOSITION TO PLAINTIFFS' AND
RESPONDENT'S RULE 72 OBJECTION TO MAGISTRATE JUDGE'S ORDER
GRANTING THE CHEVRON PARTIES' APPLICATIONS**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................1

II. BACKGROUND..................................................................................2

A. Texaco's Subsidiary Participates In State-Controlled Oil
Operations in Ecuador, Remediates, and Enters Into Settlement
and Release Agreements With Ecuador........................................2

B. The Lago Agrio Litigation And The Appointment Of Richard
Cabrera As The Ecuadorian Court's "Neutral" And "Impartial"
Court Expert....................................................................................5

C. Plaintiffs' Secret Collusion With Cabrera ..................................8

D. Plaintiffs' Misrepresentations Regarding Their Collusion With
Cabrera..........................................................................................11

E. Proceedings Before Magistrate Judge Howell........................12

III. STANDARD OF REVIEW ...............................................................14

IV. ARGUMENT .....................................................................................15

A. The Discovery Sought By Chevron Is Relevant To And
Necessary For Two Pending Foreign Proceedings. ...................15

B. The Discretionary *Intel* Factors Weigh In Chevron's Favor. ...................17

1. Respondent Champ Is Not a Party to the Lago Agrio
Litigation or the Treaty Arbitration. ...................................18

2. Ecuadorian Courts and Arbitral Panels Hearing
Investment Treaty Disputes Historically Have Been
Receptive to Assistance Under § 1782. ..............................18

3. Chevron's Application Does Not Circumvent Foreign
Proof-Gathering Restrictions. ............................................21

C. Discovery From Champ Is Relevant..........................................22

D. Judge Howell Correctly Applied The Crime-Fraud Exception. ...................22

V. CONCLUSION....................................................................................25

Case 1:10-mc-00027-GCM -DLH   Document 46   Filed 09/13/10   Page 2 of 30

Petitioner Chevron Corporation ("Chevron") respectfully submits this Opposition to "Respondent Champ and Interested Parties the Lago Agrio Plaintiffs' Rule 72 Objection to Magistrate Judge's Order Granting the Chevron Parties' Applications" (Dkt. 28).

## I.    INTRODUCTION

Plaintiffs' and Champ's Rule 72 Objection is meritless.  Plaintiffs and Champ do nothing more than raise the same arguments that this Court rejected in denying a stay of Magistrate Judge Howell's well-reasoned order granting discovery under 28 U.S.C. § 1782.  As this Court explained:  "After reviewing the matter, the court finds that [Plaintiffs] have failed to demonstrate a substantial likelihood of success on the merits.  Judge Howell's Order appears to be a correct application of the law and is in accordance with the numerous other district courts that have decided the related Section 1782 cases."  (Dkt. 32.)

This Court was exactly right:  Judge Howell correctly held that Chevron is entitled to discovery under 28 U.S.C. § 1782—the same conclusion reached by all eleven federal district courts to have considered Chevron's related § 1782 applications, as well as by the U.S. Court of Appeals for the Second Circuit and the U.S. Court of Appeals for the Fifth Circuit, both of which have approved discovery and rejected the same arguments Plaintiffs present here.[1]

Just as they have attempted in other courts, Plaintiffs seek in their Rule 72 Objections to overturn a properly-issued discovery order by arguing the supposed "merits" of their case in Ecuador.  Not only are those "merits" legally irrelevant to this § 1782 proceeding, but Plaintiffs'

_____

[1] *See* Dkt. 2 at 2-3; Dkt. 23-1; Request for Judicial Notice ("RJN-5"), Ex. C (*Chevron Corp. v. 3TM Int'l, Inc.*, No. 10-20389, 2010 WL 3491534 (5th Cir. Sept. 8, 2010)); Ex. E (*In re Applic. Of Chevron Corp.*, No. 10-mc-00021 (D. N.M. Sept. 13, 2010)).  Two additional Circuit Courts have declined to issue a stay of the discovery granted by district courts pursuant to § 1782.  Dkt. 29-1 (6th Cir. Aug. 27, 2010); RJN-5, Ex. A (*Chevron Corp. v. E-Tech*, No. 10-56410 (9th Cir. Sept. 9, 2010)).

narration is replete with misleading assertions and falsehoods boldly presented as "facts." If there were, as Plaintiffs claim, widespread contamination for which Chevron was responsible, Plaintiffs would not have submitted to the Ecuadorian court fabricated expert reports supporting their "contamination" claims—reports that their expert has testified under oath in a U.S. federal court contain conclusions about millions of dollars of remediation costs that he never reached. And Plaintiffs never would have embarked on their elaborate scheme to corrupt a supposedly "neutral" and "independent" court "special master's" "global damages" assessment by secretly hiring U.S. environmental consultants—including Champ—to ghostwrite that court expert's $27.3 billion report and thereafter attest to its "independence."

Chevron's entitlement to discovery under § 1782 does not turn on the merits (or in this case, meritlessness) of the underlying Ecuadorian litigation, but simply on whether Chevron has met the statutory and discretionary factors associated with § 1782. As Magistrate Judge Howell correctly ruled, these statutory and discretionary factors are satisfied here.

## II. BACKGROUND

The evidence of Plaintiffs' wrongdoing is undeniable. Yet Plaintiffs apparently believe that if they can pile-up enough falsehoods, citing primarily to their own unverified, previously-dismissed complaint seeking to stay Chevron's international arbitration claim and to self-serving lawyer declarations, this Court will overlook their egregious misconduct.

**A.    Texaco's Subsidiary Participates In State-Controlled Oil Operations in Ecuador, Remediates, and Enters Into Settlement and Release Agreements With Ecuador.**

Beginning in 1964, Texaco Petroleum Company ("TexPet"), held a financial stake in an oil consortium (the "Consortium") in Ecuador. *Republic of Ecuador v. ChevronTexaco Corp.* ("*ROE*"), 376 F. Supp. 2d 334, 339-40 (S.D.N.Y. 2005). After TexPet and another member of the consortium (the Ecuadorian "Gulf" Oil Company) discovered significant oil reserves in 1969,

a military *junta* assumed power in Ecuador in 1972 and sought greater control over the nation's petroleum resources. *Id.* at 339. To avoid losing all of their investment, TexPet and Gulf were required to agree to revised concession terms and surrender a significant portion of their concession rights and interests to the Ecuadorian state-run oil company (now known as Petroecuador). *Id.* at 339-40. By 1976, Petroecuador became the majority 62.5% owner of the consortium. *Id.* at 340. From 1990 to the present, Petroecuador has been the *sole* operator, and from 1992 to now, the *sole* owner, of exploration and production operations in the former concession area, giving it an undisputed role in "authorizing, directing, funding, and profiting from" the consortium's activities. *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 554 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470 (2d Cir. 2002); *see also* Dkt. 3-10 at 6 (Chevron's Notice of Arbitration).

Once the Ecuadorian government made it clear that the shortened concession term would expire without extension, TexPet entered into negotiations with Ecuador and Petroecuador about environmental remediation of former consortium activities. *ROE*, 376 F. Supp. 2d at 341-42. After two independent audits of the environmental conditions at the former consortium sites, TexPet, Ecuador, and Petroecuador entered into a Memorandum of Understanding in 1994, and a settlement agreement in 1995, regarding remediation. *Id.*[2]

The 1995 agreement provided that TexPet would remediate a portion of the former con-

---

[2] As one example of the fabrications in Plaintiffs' and Respondent's Rule 72 Objections, it is these *pre-remediation* audits that Plaintiffs falsely point to (Dkt. 28 at 2-3) as "proving" that contamination persisted *after* TexPet's remediation was complete. And Plaintiffs are equally dishonest about the pre-remediation audits' conclusions. For example, the Fugro-McLelland audit concluded that the majority of then-present contamination of the production facilities was attributable to Petroecuador's operations from 1990-1992 and not to TexPet's operations from 1964-1990, and that the estimated cost to do all recommended modifications and remediation work regarding historical operations was $8.5 million (including $2 million for the audit itself and development of a Remedial Action Plan)—a fraction of the multi-billion dollar remediation "damage" concocted by Plaintiffs in the ghostwritten Cabrera Report.

sortium area proportionate to its ownership interest (leaving the remainder to Petroecuador, the majority owner of the consortium, to remediate), and then be released. *ROE*, 376 F. Supp. 2d at 342. After TexPet spent more than two years and $40 million completing the remediation, Petroecuador and Ecuador certified that the 1995 settlement agreement was "fully performed and concluded," and "'proceed[ed] to release, absolve, and discharge' TexPet" from environmental liabilities associated with the former consortium operations. *Id.* Once the remediation was complete, the Ecuadorian government effectively forced TexPet out of the country, and it has had no further operations there.

In contrast, since Petroecuador took sole ownership of the consortium in 1992, it has significantly expanded operations, drilling more than 400 new wells in the former concession area (as compared to the 321 wells drilled while TexPet participated in the Consortium) and becoming one of the 100 largest oil companies in the world. OIL & GAS JOURNAL, Sept. OGJ 100 Group Posts Improved 2007 Results, Vol. 106, Issue 35, 15 Sept. 2008. During the same time, Petroecuador has developed a widely-acknowledged record of operational and environmental mismanagement, and Ecuadorian public media sources have reported that Petroecuador has been responsible for more than 1,400 separate spills from 2000 to 2008. *See Petroecuador diagnostica los daños ambientales por crudo*, EL UNIVERSO, Feb. 28, 2009. And, despite its obligations, Petroecuador delayed conducting any remediation in the concession.[3]

_____

[3] As an Ecuadorian governmental official confirmed in testimony before Ecuador's Congress on May 10, 2006, TexPet "completed the remediation of the pits that were their responsibility . . . but Petroecuador, during more than three decades, had done absolutely nothing with regard to the pits that were the state-owned company's responsibility to remediate." Shortly thereafter, Petroecuador implemented a remediation program known as the Project for Elimination of Pits in the Amazon District ("PEPDA"), and began its long-delayed remediation program. Ironically, rather than support Petroecuador's efforts to clean up the area, Plaintiffs sought to have Petroecuador shut down PEPDA shortly after it began, claiming that Petroec-

[Footnote continued on next page]

**B.    The Lago Agrio Litigation And The Appointment Of Richard Cabrera As The Ecuadorian Court's "Neutral" And "Impartial" Court Expert.**

In May 2003, rather than sue Petroecuador or TexPet, Plaintiffs sued Chevron (one of whose subsidiaries had merged with Texaco, of which TexPet was an indirect subsidiary, (Dkt. 9-9, at 37:7-13; Dkt. 3-10 at 7), in the Provincial Court of Sucumbíos in Lago Agrio, Ecuador (the "Lago Agrio Litigation").[4]  Early on, the Ecuadorian court ordered the parties to have their own "judicial inspection" experts inspect the former oil production sites to evaluate their condition and determine whether they presented any environmental risk.  (Dkt. 3-10 at 10-11.)  Plaintiffs committed blatant fraud with regard to these inspections.  In a deposition resulting from related § 1782 discovery granted to Chevron, one of Plaintiffs' former judicial inspection experts, Dr. Charles Calmbacher, testified with respect to reports Plaintiffs filed under his name in Lago Agrio:  "I did not reach these conclusions and I did not write this report."  (Dkt. 4-7 at 116:9-10.)

Plaintiffs' other experts fared little better.  As part of the judicial inspection process, if the parties' experts could not agree on the condition of a site, a panel of independent "settling experts" would evaluate the work of the parties' experts and resolve any differences.  The first—and only—time the settling experts issued a report was in February 2006, at a site called "Sacha-

---

[Footnote continued from previous page]
uador's remediation is "tampering" with the lawsuit.  *Petroecuador Is Set to Clean 230 Pits*, DIARIO LA HORA, Oct. 20, 2006.  Plaintiffs ultimately asked the Lago Agrio court to order Petroecuador to suspend any further remediation, and that court issued a temporary order to that effect.  (Dkt. 6-5 at 8.)  *See generally* Siliva Santacruz, *Turning the tables: Chevron won't kowtow to environmental activists' tactics and gives them a taste of their own medicine*, Financial Post (Sept. 2, 2010).

[4]  Texaco still maintains a separate legal identity and substantial assets.  Plaintiffs' suit in Lago Agrio proceeds primarily under a 1999 law enacted by Ecuador after TexPet remediated, *ROE*, 376 F. Supp. 2d at 342, and it is *not* a "re-filing" of *Aguinda v. Texaco, Inc.*, the suit that, Plaintiffs claim, Chevron fought to move to Ecuador.  The earlier *Aguinda* case was against *Texaco*, not Chevron, and it was dismissed on *forum non conveniens* grounds.  142 F. Supp. 2d 534, 554 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470 (2d Cir. 2002).  (Dkt. 3-10 at 7.)  The *Aguinda* suit, which involves different but overlapping plaintiffs, also involved personal-injury and property damage claims, which the Lago Agrio Litigation does not.

53," where the experts agreed with Chevron's experts' findings, concluding that TexPet had remediated the site and there was no evidence of contamination that posed a risk to human health or the environment. (Dkt. 3-10 at 11.)

Despite lacking scientific evidence of Chevron contamination, Plaintiffs continued to assert spurious claims, like they did to this Court, about Ecuadorians purportedly having to "eat, drink and bathe in toxic water" (Dkt. 20 at 2). Plaintiffs know, however, that these claims are not true. Under the supervision of the Ecuadorian court, during 2004 to 2007, drinking water samples were collected at 221 locations across the former Concession area and submitted to certified laboratories for detailed analysis. Out of the hundreds of samples and thousands of analyses performed, those laboratories found only two samples that did not meet applicable drinking water standards for hydrocarbons and metals, and the two exceptions contained slightly elevated metals that were unrelated to any oil field operations. The related claim that Chevron "deliberately dumped" "billions of gallons of waste" in Ecuador (Dkt. 20 at 2, Dkt. 28 at 2), is also grossly misleading. Plaintiffs are referring to "produced water," which is water existing naturally underground that comes to the surface during oil production and from which oil is separated before disposal. Labeling produced water "toxic" or "hazardous" is specious. The U.S. Environmental Protection Agency has concluded that produced water is not "hazardous." Declaration of Claudia M. Barrett ("Barrett Decl."), Ex. HH at 25 (Argonne National Laboratory, A White Paper Describing Produced Water from Production of Crude Oil, Natural Gas, and Coal Bed Methane, Prepared for the U.S. Dep't of Energy (Jan. 2004)); 40 C.F.R. § 261.4(b)(5) ("The following solid wastes are not hazardous wastes: . . (5) . . . produced waters"). Nor is produced water regulated as "toxic waste" in the U.S. *See* 42 U.S.C. § 6921(b)(2)(a); *see also* 40 C.F.R. §

261.4(b)(5); 40 C.F.R. § 261.24.[5]

Concerned after the settling experts rejected Plaintiffs' claims at Sacha-53 that this procedure would continue to result in the scientific exoneration of Chevron, once the settling experts rejected their claims at Sacha-53, Plaintiffs pushed to replace the judicial inspections with the appointment of a single "global damages expert." *Id.* On March 19, 2007, over Chevron's objection, the Ecuadorian court named Richard Stalin Cabrera Vega as its global damages expert. (Dkt. 6-1 at 2.)

Under Ecuadorian law, and as stated by the Ecuadorian court, a court expert like Cabrera is considered to be "an auxiliary to the Court" and strictly independent of either party. (Dkt. 6-5 at 2); Barrett Decl., Ex. V at 4-6 (Declaration of A. Callejas). Accordingly, Ecuadorian law, like U.S. law, requires that court experts act in a neutral and impartial manner. *See* (Dkt. 6-5 at 6); Barrett Decl. Ex. V at 5 (Declaration of A. Callejas). Consistent with this legal framework, the Ecuadorian court "direct[ed] [Cabrera] to maintain *strict independence* with regard to the parties, even in those activities that are not relevant, starting with the selection of his support personnel." (Dkt. 6-5 at 16 (emphasis added).)

Cabrera continually assured the court that he would act in accordance with its orders and affirmed his and his team's commitment to "absolute impartiality, honesty, and transparency." (Dkts. 6-5 at 2; Barrett Decl., Ex. U at 1 (October 11, 2007 Lago Agrio Filing); (Dkt. 6-8 at 1); Barrett Decl., Ex. V at 4-6 (Decl. of A. Callejas). In July 2007, Cabrera swore to the Ecuadorian court that "I do not have any relation or agreements with the plaintiff[s], and it seems to me to be

---

[5] Petroecuador continued to discharge produced water in the concession area into surface waters until 2004, and has discharged more produced water in the Oriente region during the past 16 years than TexPet discharged during the entire span of its operations there. (Dkt. 3-10 at 6.)

an insult against me that I should be linked with the attorneys of the plaintiffs." (Dkt. 6-4 at 1; *see also* Barrett Decl., Ex. U at 3 (October 11, 2007 Lago Agrio Filing) (Cabrera asserting that "if I need any technical information in connection with this case, all I have to do is request it from this Court; *the idea that the plaintiffs would be helping me with that [technical work] is unthinkable*" (emphasis added)).) Plaintiffs likewise denied any role in Cabrera's work. Barrett Decl., Ex. A (Cabrera Timetable).

Just over ten months after his appointment, Cabrera issued his report on April 1, 2008. He parroted Plaintiffs' claims of "serious and widespread contamination" in the former concession area, even in Sacha-53, the site that the independent panel of settling experts had earlier found to be successfully remediated. (Dkt. 4-1 at 27.) Cabrera claimed that the total damages for the environmental, social, and cultural impacts of the oil-production consortium were $19 billion, and another $8.3 billion for "unlawful profits," totaling over $27.3 billion. (Dkt. 4-6 at 51-52.) In his report, Cabrera continued to represent that his work was done *exclusively* by "impartial professionals" on his disclosed team, "[a]s stipulated in the Court order." (Dkt. 4-1 at 2.) He reaffirmed in March 2009 that "[a]ll my work has been public. I have concealed absolutely nothing . . . ." (Dkt. 8-14 at 3.)

In September of 2009, Chevron filed a notice of arbitration under the U.N. Commission on International Trade Law ("UNCITRAL") Rules pursuant to Article VI(3)(a) of the Bilateral Investment Treaty ("BIT") between the U.S. and Ecuador (the "Treaty Arbitration"). The Treaty Arbitration claim is based on Ecuador's efforts to use the Lago Agrio Litigation to shift its own environmental liabilities onto Chevron, and on the failure of the Lago Agrio court to address or remedy Plaintiffs' and Cabrera's misconduct.

**C.    Plaintiffs' Secret Collusion With Cabrera**

Contrary to Cabrera's representations and the Ecuadorian court's orders that his work be

"impartial" and "transparent," it has become evident that most, if not all, of Cabrera's report was ghostwritten by Plaintiffs' environmental consultants, including Respondent Champ. This conclusion became undeniable when Chevron obtained outtakes from the film *Crude* through a related § 1782 proceeding. The outtakes capture an 8-hour meeting between Plaintiffs' counsel, their consultants (including Respondent Champ) and Cabrera on March 3, 2007, **two weeks before** Cabrera's March 19 appointment. (*See* Dkt. 6-1; Dkt. 3-1 at 187-01-02-CLIP-01, 189-00-CLIP-01, 189-00-CLIP-02, 189-00-CLIP-03, 191-00-CLIP-01, 191-00-CLIP-02, 192-00-CLIP-01; Dkt. 3 at ¶ 7.) In that meeting, Plaintiffs' counsel Pablo Fajardo presents a PowerPoint outlining the "*Plan Para Examen Pericial Global*," or Plan for the Global Expert Assessment. Dkt. 3 at ¶ 7; Dkt. 3-1 at 187-01-02-CLIP-12. Fajardo explains to Cabrera and Plaintiffs' consultants that "here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all will contribute to that report—in other words—you see . . . *the work isn't going to be the expert's. All of us bear the burden*." *Id.* at 191-00-03 (emphasis added). Someone asks if the final report is going to be prepared only by the expert. Fajardo responds that the expert will "sign the report and review it. But all of us . . . have to contribute to that report." *Id.* One of Plaintiffs' consultants (Ann Maest) asks, "Together?" and Fajardo confirms. Maest then states, "But not Chevron," and everyone laughs. *Id.*

Later in the meeting, Plaintiffs' U.S. counsel Steven Donziger (himself the subject of a recently granted § 1782 application) proposes that he and the U.S.-based consultants form a "work committee" to present a "draft" "work plan," the first document that Cabrera would be required to sign and file with the Ecuadorian court. *Id.* at 189-00-02. Looking at Cabrera, Donziger then says, "and Richard, of course you really have to be comfortable with all that. And we'll also def—define the support the expert needs." *Id.* Later, Donziger comments, "We could

jack this thing up to $30 billion in one day." *Id*. at 193-00-01. The very fact of this meeting de-stroys Cabrera's repeated assertions of "independence"—a claim which Plaintiffs continue to make to this Court, Barrett Decl., Ex. W at 33:18-23 (H'g Tr. (Aug. 27, 2010)). Although Plain-tiffs' broadly assert that these clips were taken out of context, further "context" cannot explain away Cabrera's attendance at this covert and prejudicial meeting.

In footage taken the next day, March 4, 2007, Donziger is shown meeting with Plaintiffs' U.S. environmental consultants. (Dkt. 3-1 at 198-00-01.) After Respondent says, "I know we have to be totally transparent with Chevron in showing them what we're doing," Donziger ex-plains: "Our goal is that they don't know shit . . . and that's why they're so panicked." (*Id*. at 196-00-01.) Respondent and other consultants then tell Donziger there is no evidence that con-tamination from the pits has spread into the surrounding groundwater. Donziger responds, say-ing:

> You can say whatever you want and at the end of the day, there's a thousand peo-ple around the courthouse, you're going to get what you want. . . . Therefore, if we take our existing evidence on groundwater contamination, which admittedly is right below the source . . . [a]nd wanted to extrapolate based on nothing other than our, um, theory, . . . We can do it. And we can get money for it.

(*Id*. at 195-05-01.) He goes on, "[T]his is all for the Court just a bunch of smoke and mirrors and bullshit." (*Id*.) When Respondent Champ argues that "there is not enough information on that groundwater" contamination and that "the one hole in the remediation, is the water," Donziger ultimately breaks off the discussion, stating, "There's another point I got to make . . . with these guys, but I can't get this on camera," and the footage ends. (*Id.*)

As the outtakes and their continued misrepresentations here show, Plaintiffs' efforts to tamper with the Ecuadorian proceedings extend beyond ghostwriting Cabrera's report. The *Crude* outtakes depict Donziger explaining his use of so-called "pressure tactics" to influence a judge to prevent the judicial inspection of a suspect laboratory allegedly being used by Plaintiffs

to test for contamination in soil and water samples. Barrett Decl., Ex. X at 052-00-05; Ex. Y.

Donziger admits in the released film that "[t]his is something you would never do in the United

States . . . [b]ut Ecuador, you know, there's almost no rules here. And this is how the game is

played, it's dirty." Barrett Decl., Ex. X at 052-00-05; Ex. Y. In another scene, Donziger and

Plaintiffs' agents consider raising their "own army," a "specialized group" "to watch over the

court," for which, "if we need weapons, we can provide weapons." Barrett Decl., Ex. X at 350-

04-02, Ex. Z. In a separate conversation, when a female associate tells Donziger that no judge

would rule against the Plaintiffs because "[h]e'll be killed," Donziger boasts that no judge would

rule against Plaintiffs because, though he might not actually be killed, "he thinks he will be . . . .

Which is just as good." Barrett Decl., Ex. X at 129-00-02, Ex. AA. As the Southern District of

New York ruled last week, "the outtakes contain substantial evidence of misconduct in and relat-

ing to the Ecuadorian litigation." RJN-5, Ex. D at 3 (*In re Applic. of Chevron Corp.*, No. 10-

MC-00001, 2010 WL 3489341 (S.D.N.Y. Sept. 7, 2010)).

## D. Plaintiffs' Misrepresentations Regarding Their Collusion With Cabrera

At first, in the Lago Agrio Litigation, as noted above, Plaintiffs and Cabrera denied—in

the strongest terms—that they collaborated. Plaintiffs then claimed in U.S. federal-court filings

that their only interaction with Cabrera was a single submission of documents to the Ecuadorian

court, in response to a specific Cabrera request and court order in January 2008. For example,

Plaintiffs asserted in a pleading to the district court in Denver that Cabrera's statement—that it

would be "unthinkable" that Plaintiffs were providing him with "technical information and sup-

port staff"—was truthful because it was "made *before* [a January 2008] court order authorizing

him to get material from the parties. When the Court *ordered* Cabrera to consider whatever

submissions were provided by the parties, *the landscape changed considerably*." Barrett Decl.,

Ex. BB at 2 (last emphasis added) (Plaintiffs' Reply in *Stratus* in Support of Motion for Protective Order; May 17, 2010).

Chevron proved all of this false, over Plaintiffs' protestations that Chevron was engaged in a "highly speculative . . . diversionary fishing expedition," Barrett Decl., Ex. CC at 30 (Plaintiffs' Brief and Special Appendix; June 14, 2010, in *Berlinger*), a characterization the Southern District of New York rejected just last week. RJN-5, Ex. D at 5 (*In re Applic. of Chevron Corp.*, No. 10-MC-00001, 2010 WL 3489341). As a result of the U.S. discovery Chevron has obtained, Plaintiffs finally admitted—in late June 2010—that they "advocate[d] to" Cabrera their own "findings, conclusions, and valuations," which they claimed they did *in response to* an April 2008 Ecuadorian court order. (Dkt. 28 at 6.) But this fallback position is false as well: the *Crude* outtakes demonstrate that Plaintiffs met with Cabrera well before April 2008, and in fact before he was officially appointed.

While obstructing Chevron's § 1782 efforts whenever possible, Plaintiffs have simultaneously petitioned the Ecuadorian court to end the Lago Agrio Litigation before more incriminating details can come to light. On June 21, Plaintiffs asked the Ecuadorian court to order the parties "to submit to the Court, within the term of 30 days," any final evidence regarding the global damage assessment and fix "a final term of 15 days during which [the parties] may comment on the information submitted by the opposing party" so that the Ecuadorian court may proceed to "final judgment." (Dkt. 8-12 at 8.) The Ecuadorian court has set a deadline of September 16, 2010 for the parties to submit any supplemental evidence relating to damages (Dkt. 8-13.)

E.    **Proceedings Before Magistrate Judge Howell**

On August 16, 2010, Chevron filed an application in this Court pursuant to § 1782 for leave to serve Respondent Champ with a subpoena that included document production requests.

As Chevron noted in its application, Respondent Champ contributed to the ghostwriting of the Cabrera report, he was involved in the effort to conceal that ghostwriting, and he was a participant in the March 3, 2007 meeting at which a "remediation plan" was presented to Cabrera. (Dkt. 2 at 8-12.) On August 27, 2010, Judge Howell granted the Application over Plaintiffs' and Respondent's fully briefed and argued opposition. (Dkt. 26.)

Judge Howell found that the Lago Agrio Litigation and the Treaty Arbitration both qualify as foreign proceedings under § 1782(a), and that Chevron sought the requested discovery for use in those proceedings. (Dkt. 26 at 7) Judge Howell further found that the *Intel*[6] factors weighed in favor of granting Chevron's Application. (*Id.* at 8-10.) The Magistrate Judge also noted that any consulting privilege over documents that were provided to Cabrera or to the Lago Agrio court had been waived by disclosure and that any other privilege was rendered inapplicable because the crime-fraud exception applies (*Id.* at 11-13.)

Plaintiffs then filed an Emergency Motion to Stay Discovery Pending Rule 72 Review (Dkt. 27), which this Court denied (Dkt. 32). Notably, this Court found that Plaintiffs failed to show a likelihood of success on the merits of the matter and indicated that Judge Howell's application of the law to the facts of this matter was sound. (*Id.*)

After unsuccessfully attempting to stall this proceeding in other ways (*e.g.*, a letter to this Court seeking an "Emergency Telephonic Conference" (Dkt. 33) and a Motion for Extension of Time (Dkt. 34), which Judge Howell denied), Plaintiffs and Respondent made a deficient production of documents in response to the subpoena. Namely, they failed to conduct adequate searches of Respondent's computer and files and they have withheld as "non-responsive" docu-

---

6    In *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), the Supreme Court articulated four non-exclusive factors to determine whether a court should grant discovery under § 1782. These factors are discussed below.

ments that in all likelihood are responsive to the subpoena.

Plaintiffs' Rule 72 Objection presents no new arguments; all it does is restate (almost verbatim) the arguments that have already been rejected by Judge Howell and this Court.

## III. STANDARD OF REVIEW

This Court reviews a Magistrate Judge's nondispositive order for clear error. As Plaintiffs acknowledge, "'a subpoena is not a final Order, and may be called into question by the subpoenaed party as provided in Rule 45, Federal Rules of Civil Procedure, *or may be reviewed by the district court under Section 636(b) upon a showing that the order is clearly erroneous or contrary to law.*'" (Dkt. 28 at 11 (quoting *In re Qwest Communs. Int'l, Inc.*, No. 3:08-mc-93, 2008 WL 2741111, at *7 (W.D.N.C. July 9, 2008) (Howell, J.).)

A Section 1782 discovery order is nondispositive. *See In re Petition of Compania Chilena de Navegacion*, 2004 U.S. Dist. LEXIS 6408, at *3 (E.D.N.Y. Jan. 29, 2004); *In re Application of Heraeus Kulzer GmbH*, 2010 WL 2559795, at *1-*2 (N.D. Ind. June 22, 2010); *In re Oxus Gold PLC*, 2007 WL 1037387, at *2 (D.N.J. Apr. 2, 2007); *In re Duizendstraal*, No. 3:95-mc-150-x, 1997 WL 195443, at *1 (N.D. Tex. Apr. 16, 1997). Accordingly, it may be set aside only if clearly erroneous or contrary to law. *See Collins v. TIAA-CREF*, No. 3:06-cv-304-RJC, 2009 WL 973106 (W.D.N.C. April 8, 2009); *Ukrnafta v. Carpatsky Petroleum Corp.*, No. 3:09-mc-265 (JBA), 2009 WL 2877156, at *5 (D. Conn. Aug. 27, 2009); *In re Duizendstraal*, 1997 WL 195443, at *3.[7]

In any event, this Court should make clear that under either standard—*de novo* or clear error—Judge Howell's decision was correct.

---

[7] Plaintiffs cite cases holding that orders granting § 1782 applications are immediately appealable. (Dkt. 28 at 8, n. 7.) None of those cases determines the proper standard of review.

# IV.     ARGUMENT

Judge Howell properly held that the statutory *Intel* factors were satisfied and all four discretionary factors cut in Chevron's favor.  This Court should affirm in full.  Alternatively, it could affirm based on collateral estoppel principles, which foreclose Plaintiffs from presenting the same arguments that have already been rejected by more than a dozen federal courts.

## A.     The Discovery Sought By Chevron Is Relevant To And Necessary For Two Pending Foreign Proceedings.

"[Section] 1782 provides that a federal district court 'may order' a person 'resid[ing]' or 'found' in the district to give testimony or produce documents 'for use in a proceeding in a foreign or international tribunal . . . upon the application of any interested person." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246 (2004).  Plaintiffs concede that Chevron satisfies two of the three statutory prongs—Chevron is an "interested person," and the person from whom discovery is sought (Champ) resides in this district—but they contend that the discovery sought is not "for use" in a proceeding before a "foreign tribunal."  (*See* Dkt. 28 at 11-17.)

Plaintiffs make two arguments on this point.  First, they argue that because the discovery sought will be used to undermine the credibility of the purportedly-independent expert retained by the tribunal in the Lago Agrio Litigation, it is not "for use" in that proceeding. (*Id.* at 11-13.) Second, they argue that the Treaty Arbitration is not a "foreign tribunal" (*Id.* at 13-17.)  Although Plaintiffs claim that this presents the Court with a "unique legal question," this Court is not the first to hear these arguments from Plaintiffs, and, in every case in which they were raised, they have been rejected.  *E.g.*, *Berlinger*, 2010 U.S. Dist. LEXIS 47034, at *41, *aff'd by* Order, *Chevron Corp. v. Berlinger*, Nos. 10-1918-cv, 10-1966-cv (2d Cir. July 15, 2010) (available at Dkt. 10-2.).  In fact, in denying Plaintiffs' motion to stay discovery, both this Court, (Dkt. 32), and the Sixth Circuit (Dkt. 29-1 at 3-4) held that Plaintiffs failed to show a likelihood of success

on the merits of these same arguments.

Plaintiffs argue that because the evidence sought by Chevron will be used to challenge the credibility of the court expert in the Lago Agrio Litigation, the discovery is not "for use" in that litigation. The "for use in" prong of Section 1782 has never been interpreted in the way Plaintiffs now suggest, but rather generally has been interpreted as a minimal relevance requirement. *E.g.*, *In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*, 466 F.Supp.2d 1020, 1029 (N.D.Ill. 2006) ("This Court holds that 'for use in' mirrors the requirements in Federal Rule of Civil Procedure 26(b)(1) and means discovery that is relevant to the claim or defense of any party, or for good cause, any matter relevant to the subject matter involved in the foreign action."). Indeed, Plaintiffs cite no authority for an interpretation that would prevent the use of Section 1782 in cases of fraud, and as Plaintiffs have conceded in a related Section 1782 action, discovery eliciting evidence of a foreign court's corruption would be "for use in" that foreign proceeding.[8] Furthermore, this exact argument was rejected by the Middle District of Tennessee three weeks ago. (Dkt. 23-1 at 4 ("Respondent's second argument, that discovery used to demonstrate the bias of a foreign court is not 'for use in' that court, is similarly unpersuasive.").) Eleven district courts, and the U.S. Courts of Appeals for the Second Circuit and Fifth Circuit, have concluded that the fraud-related discovery sought by Chevron is integral to the proceedings in Ecuador, and § 1782 is the proper mechanism for that discovery. (Dkt. 2 at 2-3; Dkt. 23-1; RJN-5, Ex. C (*3TM*, No. 10-20389, 2010 WL 3491534); RJN-5, Ex. E (*In re Applic. Of Chevron Corp.*, No. 10-mc-00021 (D. N.M. Sept. 13, 2010)).)

---

[8] This issue was posed to Plaintiffs in the form of a hypothetical by Judge Leval of the Second Circuit. At that hearing, Plaintiffs did not dispute that, in the case of hypothetical court corruption, the requested discovery would likely be "for use in" the foreign tribunal. Barrett Decl., Ex. DD at 19:23-20:22 (H'g Tr., *Chevron Corp. v. Berlinger*, No. 10-1918-cv (2nd Cir. July 14, 2010)).

Plaintiffs' next argument, that Section 1782 cannot be used for the Treaty Arbitration because a "private arbitration" is not a "foreign tribunal," is also meritless. Plaintiffs' argument is based on a fundamental mischaracterization of the Treaty Arbitration. As the Southern District of New York found, the "arbitration here at issue is *not* pending in an arbitral tribunal established by private parties. It is pending in a tribunal established by an international treaty, the BIT between the United States and Ecuador, and pursuant to UNCITRAL rules." (Dkt. 9-1 at 8-9.) Such "international arbitral bodies operating under UNCITRAL rules constitute 'foreign tribunals' for purposes of Section 1782." *Id.*; *see also* Dkt. 2 at 15. Unsurprisingly, every court to have considered Plaintiffs' argument that the Treaty Arbitration is not before a "foreign tribunal" for the purposes of Section 1782 has rejected it. *E.g.*, Dkt. 9-1 at 14; Dkt. 23-1 at 3-4. *See also, e.g.*, *Ukrnafta v. Carpatsky Petroleum Corp.*, Case No. 3:09 MC 265 (JBA), 2009 WL 2877156, at *4 (D. Conn. Aug. 27, 2009); *In re Oxus Gold PLC,* Case No. MISC 06-82-GEB, 2007 WL 1037387, at *5-9 (D.N.J. Apr. 2, 2007) (Brown, C.J.).[9]

## B.    The Discretionary *Intel* Factors Weigh In Chevron's Favor.

Although materials sought under § 1782, if relevant, are "presumptively discoverable," *In re Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998), the Supreme Court in *Intel* set forth four discretionary factors that "bear consideration in ruling on a § 1782(a) request":  (1) whether "the per-

---

[9] The cases Plaintiffs cite, on the other hand, are outdated and inapposite. Both *NBC v. Bear Stearns & Co., Inc.*, 165 F.3d 184 (2d Cir. 1999), and *Republic of Kazakhstan v. Beidermann*, 168 F.3d 880 (5th Cir. 1999), were superseded by the Supreme Court's decision in *Intel*. *See Berlinger*, 2010 U.S. Dist. LEXIS 47034, at *18-19 n.45; *Comision Ejecutiva v. Nejapa Power Co., LLC*, 2008 U.S. Dist. LEXIS 90291, at *3 (D. Del. Oct. 14, 2008) ("the Supreme Court's decision in *Intel* (and post-*Intel* decisions from other district courts) indicate that § 1782 does indeed apply to private foreign arbitrations."). Further, the cases cited by Plaintiffs involve purely private arbitrations, and thus are distinguishable from the Treaty Arbitration. *Berlinger*, 2010 U.S. Dist. LEXIS 47034, at *17-18; *In re Oxus Gold PLC*, 2007 U.S. Dist. LEXIS 24061 (D.N.J. Apr. 2, 2007).

son from whom discovery is sought is a participant in the foreign proceeding"; (2) the receptivity of the foreign tribunal to U.S. court assistance; (3) whether the § 1782 request is an attempt to "circumvent foreign proof-gathering restrictions"; and (4) whether the documents and testimony sought are "unduly intrusive or burdensome." *Id.* at 264-65. Judge Howell correctly concluded that all four factors weighed in Chevron's favor. Plaintiffs address only the first three factors in their Motion and do not challenge Judge Howell's conclusion that the fourth factor—whether the discovery request is burdensome—weighs in favor of discovery here.

### 1. Respondent Champ Is Not a Party to the Lago Agrio Litigation or the Treaty Arbitration.

Respondent Champ is not a party to the Lago Agrio Litigation or the Treaty Arbitration; therefore, the first *Intel* factor is met. *See Intel*, 542 U.S. at 264; *In re Roz Trading Ltd.*, 2007 U.S. Dist. LEXIS 2112, at *6 (N.D. Ga. Jan. 11, 2007) ("Respondent is not a party to the arbitration, and on this ground alone the first *Intel* factor is satisfied."). Mr. Champ resides in Asheville, North Carolina, outside the jurisdiction of both foreign tribunals. Thus, this is not a situation where "[the] foreign tribunal[s] have jurisdiction over those appearing before [them], and can [themselves] order them to produce evidence." *Intel*, 542 U.S. at 264.[10]

### 2. Ecuadorian Courts and Arbitral Panels Hearing Investment Treaty Disputes Historically Have Been Receptive to Assistance Under § 1782.

Plaintiffs next argue that Chevron has not shown that Ecuadorian courts or arbitral panels are receptive to federal court assistance under § 1782. But "receptivity" is not a question of

---

[10] To the extent Plaintiffs are suggesting that Chevron should be required to seek these materials from Cabrera, in a decision just last week, the Fifth Circuit noted that such a requirement would be "senseless." As that court held, "the Ecuadorian court ordered Cabrera to disclose all of the source material for his report. Consequently, if Cabrera relied on [Plaintiffs' consultant's] documents but did not disclose them, he is unlikely to turn them over now, as doing so would reveal he violated the Ecuadorian court's order." RJN-5, Ex. C at 4-5 (*3TM*, No. 10-20389, 2010 WL 3491534).

whether the foreign court would permit discovery in this or any other particular case; instead, it is an inquiry into how a foreign legal system "might respond to § 1782 assistance from a United States court." *In re Applic. of OOO Promnefstroy*, 2009 WL 3335608, at *20 (S.D.N.Y. Oct. 15, 2009). Further, it is *Plaintiffs'* burden to prove the foreign tribunals are unreceptive, *not* Chevron's burden to show receptivity. *Bayer*, 146 F.3d at 196; *see also Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995). Here, Plaintiffs have not identified any decision in which any court has found that Ecuadorian courts or arbitral panels like the Treaty Arbitration panel are unreceptive to U.S. discovery under § 1782.

To the contrary, at least thirteen different courts (including eleven related to the Lago Agrio Litigation) have determined that § 1782 discovery *is* appropriate to aid Ecuadorian courts. *See, e.g.*, *In re Compania Chilena de Navegacion Interoceanica S.A.*, 2004 U.S. Dist. LEXIS 6408 (E.D.N.Y. Jan. 29, 2004) (ordering depositions and production of evidence to assist in Ecuadorian proceeding); *In re Noboa*, 1995 U.S. Dist. LEXIS 14402, at *14-16 (S.D.N.Y. Oct. 3, 1995) (granting § 1782 discovery where "the courts of Ecuador have not expressed their official views on the need for the proposed discovery or as to whether the evidence sought would be rejected"); RJN-5, Ex. C at 5 (*3TM*, No. 10-20389) ("[T]here has been no 'clear directive' from the Ecuadorian court that it 'would reject evidence' produced in the United States."); *Berlinger*, 2010 U.S. Dist. LEXIS 47034, at *19 ("District courts have granted § 1782 applications routinely in connection with matters pending in Ecuadorian courts, including the Lago Agrio Litigation."). In fact, Chevron already has submitted evidence collected from its Section 1782 actions to the Ecuadorian court in the Lago Agrio Litigation. The Ecuadorian court did not reject that evidence, but rather incorporated Chevron's filings into the docket, stating that the contents of the submission "will be taken into account at the appropriate point in the proceeding[.]" (Dkt.

23-2 at 1.)

In an effort to prevent discovery, Plaintiffs have petitioned the Lago Agrio court to "order" itself unreceptive to evidence from all § 1782 proceedings in the United States. (Dkt. 8-9 at 3.) The Lago Agrio court has not yet ruled on this request. But even if the Lago Agrio court were to disallow the introduction of the evidence sought by Chevron's application, this Court should not be dissuaded from allowing the discovery Chevron seeks. The Supreme Court has held that a § 1782 application may be granted even in the face of express opposition of the foreign tribunal hearing the matter. *See Intel*, 542 U.S. at 265 (holding that § 1782 discovery could be proper despite the fact that the relevant tribunal, the European Commission, "ha[d] stated in *amicus curaie* briefs to this Court that it does not need or want the District Court's assistance."). And plainly here, where Chevron alleges collusion and fraud among Plaintiffs, a purportedly neutral court expert, and the Ecuadorian Government, a ruling from the court in the suspect proceeding indicating it would not accept evidence of that fraud should carry little weight. *Berlinger*, 2010 U.S. Dist. LEXIS 47034, at *21 ("[T]he petitioners seek relief here in part out of concern that political influence may have been brought to bear in Ecuador in an inappropriate way.").

Plaintiffs' argument is even less persuasive with respect to the Treaty Arbitration. They offer no case law or evidentiary support for the assertion that the Treaty Arbitration panel would be "unreceptive" to the requested discovery. But, as the New Jersey federal court found, the evidence sought by Chevron in these Section 1782 proceedings is relevant to both the Lago Agrio Litigation and the Treaty Arbitration:

> The documents are clearly, in this Court's view, relevant to the proceedings before the arbitration …. The evidence sought is probative of issues in the Lago Agrio litigation, as Chevron needs the sought evidence to impeach the Cabrera report if its suspicions of an improper relationship are borne out. Moreover, the

evidence sought goes to the heart of the Treaty Arbitration's concern with the conduct of the Lago Agrio litigation.

(Dkt. 9-9 at 45, 47.)[11]

### 3. Chevron's Application Does Not Circumvent Foreign Proof-Gathering Restrictions.

Plaintiffs' assertion that Chevron is attempting to circumvent foreign proof-gathering restrictions is baseless. The purpose of § 1782 is "to assist foreign tribunals in obtaining relevant information that the tribunals may find useful but, for reasons having no bearing on international comity, they cannot obtain under their own laws." *Intel*, 542 U.S at 262. There is no requirement for a petitioner to first seek the materials from the foreign tribunal before filing a § 1782 application. *In re Bayer*, 146 F.3d at 196 ("Indeed, a 'quasi-exhaustion requirement . . . has been rejected by those courts that have addressed it.").

Federal district courts granting related § 1782 applications filed by Chevron have found that this factor weighed in Chevron's favor, uniformly holding that Chevron's requests for discovery have been sought in good faith and did not conceal an attempt to circumvent foreign

---

[11] Plaintiffs' other claim, that the Court should take into account that this is "many years after the evidentiary phase of the Lago Agrio Litigation has ended," (Dkt. 28 at 19-20) is a mischaracterization. On March 23, 2010, Plaintiffs asked the Lago Agrio court to "dispense with the three [pending court] expert investigations" and then order that "there is not any more evidence to be taken" and that the case "is now ripe for judgment." Barrett Decl., Ex. HH (Plaintiffs' filing of March 23, 2010 in the Lago Agrio Litigation). On March 24, 2010, Plaintiffs asked the court to establish a "one-time non-extendible period of three days" for the submission of all evidence "to prove the presence of the essential errors" alleged by Chevron in the work of Plaintiffs' experts at twelve different inspection sites. *Id.*, Ex. II (Plaintiffs' filing of March 24, 2010 in the Lago Agrio Litigation). Plaintiffs also asked the court to order that "the case is ripe for judgment." *Id.* Plaintiffs would not be pressing the Lago Agrio court to close the evidentiary phase if, as Plaintiffs assert to this Court, the time for submission of evidence had closed years ago. Judge Howell correctly rejected Plaintiffs' claims that the evidentiary period in the Lago Agrio Litigation is over, and found that an expedited schedule was appropriate because of the "time limitations imposed by the foreign tribunal." (Dkt. 26 at 7.)

proof-gathering restrictions.[12]  (*See also* Dkt. 26 at 9-10 ("[I]t does not appear that the applications now pending before the court are an attempt to circumvent the court in the Hague or in Ecuador.").)  And, as the District Court for the Southern District of California held, there is no authority for the proposition that by dismissing on *forum non conveniens* grounds litigation that was not properly brought in the United States, a party forfeits its ability to seek discovery of a massive fraud in foreign litigation related to the same subject matter.  Barrett Decl., Ex. B at 7 (Order, *Chevron Corp. v. E-Tech Int'l*, No. 10-cv-1146-IEG (S.D. Cal. Sept. 10, 2010).[13]

### C.     Discovery From Champ Is Relevant.

Plaintiffs argue that Chevron has not shown "good cause" for discovery.  But Champ made a presentation regarding remediation methods and costs at a meeting whose purpose was to provide Cabrera with a plan for the purportedly "independent" global assessment he was to conduct, two weeks before Cabrera was officially named the court expert.  Champ's first-hand knowledge of this event as well as his knowledge regarding the writing of the global assessment are *highly* relevant in litigation in which Plaintiffs seek to use Cabrera's report as the basis for exacting a $27.3 billion judgment.

### D.     Judge Howell Correctly Applied The Crime-Fraud Exception.

Judge Howell correctly found that the crime-fraud exception deprived responsive materi-

---

[12]  *See, e.g.*, Dkt. 9-2 at 10 ("There is nothing before this court to suggest that Chevron is attempting to conceal an attempt to circumvent foreign proof-gathering restrictions."); Dkt. 9-4 at 6 ("Chevron's discovery requests do not attempt to circumvent foreign proof-gathering restrictions as they are a good-faith effort to obtain probative evidence."); *id.*, Dkt. 9-5 at 2 ("The Court finds that the Application does not conceal an attempt to circumvent foreign proof-gathering restrictions, and the discovery is not being sought in bad faith."); *Berlinger*, 2010 U.S. Dist. LEXIS 47034, at *22 (finding that respondents' argument that Chevron attempted to circumvent foreign proof gathering restrictions "is without merit").

[13]  Plaintiffs have argued that Chevron's use of § 1782 applications "has reached abusive levels," (Dkt. 28 at 22), but the proceedings in multiple jurisdictions reflects the expansive nature of Plaintiffs' fraud.

als of any privilege to which they might otherwise have been entitled: "While this court is unfa-

miliar with the practices of the Ecuadorian judicial system, the court must believe that the con-

cept of fraud is universal, and that was has blatantly occurred in this matter would in fact be con-

sidered fraud by any court."[14] (Dkt. 26 at 12.)  The Southern District of California in a related

§ 1782 proceeding also found that the crime fraud exception precludes privilege claims by Plain-

tiffs regarding their conduct in Ecuador, RJN-5, Ex. B (Order, *In re Applic. of Chevron Corp.*,

No. 10-cv-1146 (S.D. Cal. Sept. 10, 2010), as has the District Court for the District of New Jer-

sey, (Dkt. 31-2 at 23).

Further, the Supreme Court has condemned similar conduct as a crime and fraud.  In

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), attorneys for a patent

seeker ghostwrote an article "signed by an ostensibly disinterested expert" endorsing its device,

and then relied on that article in defending its patent to the Circuit Court.  *Id.* at 240.  As in this

case, the nominal author claimed the document to be his work and the authorship came to light

only through compelled discovery in other proceedings.  *Id.* at 247.  The Court was "unanimous

in condemning the transaction disclosed by this record."  *Id.* at 251.  It called what the ghostwrit-

ing party had done "a deliberately planned and carefully executed scheme to defraud," "decep-

---

[14] Indeed, under *either* U.S. or Ecuadorian law, Plaintiffs' conduct violated multiple criminal
laws, civil prohibitions against fraud, and lawyers' ethical obligations.  The Ecuadorian court
required Cabrera and his team to "perform [their] duties . . . with complete *impartiality* and
*transparency* vis-à-vis the parties," (Dkt. 6-2 at 3 (emphases added)), and to "observe and
ensure . . . the impartiality of [their] work, and the *transparency* of [their] activities . . . ."
(Dkt. 6-5 at 12 (emphasis added).)  And Plaintiffs' defense of *ex parte* contacts with Cabrera
also conflicts with the current and prior version of the Ecuadorian Constitution, and a host of
other Ecuadorian authorities, as made clear by the affidavits of Dr. Cesar Coronel Jones and
Dr. Gustavo Romero. Barrett Decl., Ex. EE at ¶ 20 n.16, ¶¶ 16-31 (Coronel Aff.); Ex. FF at ¶
56. *Id.* at ¶¶ 56, 57, 60 (Romero Aff.).  If the Court decides to apply a *de novo* standard of
Rule 72 review, it has the authority to consider these additional materials.  *See United States
v. Howell*, 231 F.3d 615, 621-22 (9th Cir. 2000).

tion and fraud," "corrupt activities in suppressing the truth concerning the authorship of the article," "tampering with the administration of justice," "deceptive attribution of authorship," "fraud on that Court," and a "plan to publish an article for the deliberate purpose of deceiving." *Id.* at 245, 246, 247, 249, 250.

The evidence establishes that Plaintiffs' interactions with Respondent were "for the purpose of getting advice for the commission of a crime or fraud." *In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998) ("The crime-fraud exception applies to both the attorney-client privilege and the work-product doctrine"); *see also Chevron U.S.A., Inc. v. United States*, 80 Fed. Cl. 340, 364 (Fed. Cl. 2008) (government counsel's *ex parte* contact with independent petroleum engineer, appointed by contract and administrative order as neutral arbiter of equity valuations for certain property, vitiated privilege under crime-fraud exception), *writ of mandamus granted in part*, *In re United States*, 321 Fed. Appx. 953 (Fed. Cir. 2009); *G.K. Las Vegas Ltd. P'ship v. Simon Property Group, Inc.*, 671 F. Supp. 2d 1203, 1207, 1229 (D. Nev. 2009) ("counsels' misconduct in dealing" *ex parte* with court-appointed expert contravened "the Court's intention that the forensic examinations be *independent* and conducted in an *impartial* manner" (emphases in original)).[15]

Plaintiffs err in claiming that the crime-fraud exception must be applied on an in-camera, document-by-document basis. (Dkt. 28 at 24-25.) They cite *United States v. Zolin*, 491 U.S. 554 (1989), but that case actually stands for the proposition that *whether* to conduct *in camera* review lies within "the sound discretion of the district court" and that an *in camera* review *may* be per-

---

[15] Plaintiffs attempt to justify their fraud by trying to smear Chevron with allegations of "*ex parte* contacts," with the Court, which were purportedly *observed* by Plaintiffs' associates, who routinely surround the Lago Agrio courthouse. (Dkt. 28 at 9, n. 9.) Nothing in these vague accounts suggests anything remotely like Plaintiffs' outrageous and unlawful misconduct.

formed to determine if the crime-fraud exception applies, but is not necessary. *Id.* at 572. On the contrary, it is well-established that where fraud relating to privileged materials can be shown by non-privileged evidence, the crime-fraud exception may be applied without reviewing any privileged materials at all—*in camera* or otherwise. *See Zolin*, 491 U.S. at 575 ("The Court of Appeals also will have the opportunity to review the partial transcripts, and to determine whether, *even without in camera review of the tapes*, the IRS presented sufficient evidence to establish that the tapes are within the crime-fraud exception") (emphasis added); *In re Sealed Case*, 162 F.3d 670, 674 (D.C. Cir. 1998) (finding crime-fraud exception based on non-privileged evidence not reviewed *in camera*). Thus, where, as here, "independent evidence supports a finding of probable cause to believe that [requested files] fall within the crime-fraud exception, *in camera* review is not necessary." *United States v. Kaplan*, No. 02-cr-883, 2003 WL 22880914, at *10 (S.D.N.Y. Dec. 5, 2007).

## V. CONCLUSION

Judge Howell correctly held that Chevron is entitled to discovery under 28 U.S.C. § 1782. This Court should deny Plaintiffs' Rule 72 Objection in its entirety.

Date: September 13, 2010

Respectfully submitted,

/s/ George W. Saenger
George W. Saenger, Esq.
ADAMS, HENDON, CARSON, CROW & SAENGER,
P.A.
72 Patton Avenue
Asheville, NC  28801
T:  (828) 252-7381
F:  (828) 252-5018
E:  gsaenger@adamsfirm.com
North Carolina State Bar No: 7299

/s/ Andrea E. Neuman
Andrea E. Neuman, Esq. (*admitted pro hac vice*)
T. Michael Crimmins, Esq. (*admitted pro hac vice*)
GIBSON, DUNN & CRUTCHER, LLP
3161 Michelson Drive
Irvine, CA  92612-4412
T:  (949) 451-3937
F:  (949) 451-4220
E:  ANeuman@gibsondunn.com


/s/ Peter E. Seley
Peter E. Seley, Esq. (*admitted pro hac vice*)
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Ave., N.W.
Washington, DC  20036
T:  (202) 887-3689
F:  (202) 530-9594
E:  PSeley@gibsondunn.com

Attorneys for Applicant
CHEVRON CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on September 13, 2010, on counsel registered for electronic service via the Court's CM/ECF system and on the following via electronic mail:

| | |
|---|---|
| Wyatt S. Stevens<br>ROBERTS & STEVENS, P.A.<br>BB&T Building, Suite 1100<br>P.O. Box 7647<br>Asheville, NC 28802 | ***Counsel for Respondent Charles Champ and Interested Parties the Ecuadorian Plaintiffs***<br><br>T: 828-258-6992<br>wstevens@roberts-stevens.com |
| Jonathan S. Abady<br>Ilann Maazel<br>Andrew F. Wilson<br>Matthew Brinckerhoff<br>EMERY CELLI BRINCKERHOFF &<br>ABADY LLP<br>75 Rockefeller Plaza, 20th Floor<br>New York, NY 10019 | ***Counsel for Plaintiffs in the Yaiguaje Litigation (S.D.N.Y.); Laura Belanger, Peter Jones and Interested Parties, the Plaintiffs in the Yaiguaje Litigation [Dist. of CO.];[SD Texas]***<br><br>T: 212-763-5000<br>F: 212-763-5001<br>jabady@ecbalaw.com<br>imaazel@ecbalaw.com<br>awilson@ecbalaw.com |
| Steven R. Donziger<br>245 W. 104th St.<br>New York, NY 10025-4249 | ***Counsel for Plaintiffs in the Yaiguaje Litigation (S.D.N.Y.)***<br><br>T: 917-566-2526<br>sdonziger@donzigerandassociates.com |
| Eric W. Bloom<br>Lauren Butcher<br>Tomas Leonard<br>WINSTON & STRAWN LLP<br>1700 K Street, NW<br>Washington, D.C. 20006 | ***Counsel for ROE in SDNY II Litigation***<br><br>T: 202-282-5743<br>F: 202-282-5100<br>ebloom@winston.com<br>lbutcher@winston.com<br>tleonard@winston.com |
| C. MacNeil Mitchell<br>WINSTON & STRAWN LLP<br>200 Park Avenue<br>New York, NY 10166 | ***Counsel for ROE in SDNY II Litigation***<br><br>T: 212-294-6700<br>F: 212-294-4700<br>cmitchell@winston.com |

**Page 1**

| | |
|---|---|
| Ricardo E. Ugarte<br>WINSTON & STRAWN LLP<br>35 Wacker Drive<br>Chicago, IL 60601 | ***Counsel for ROE in SDNY II Litigation***<br><br>T: 312-558-6130<br>F: 312-558-5700<br>rugarte@winston.com |
| David S. Bloch<br>WINSTON & STRAWN LLP<br>101 California Street<br>San Francisco, CA 94111-5801 | ***Counsel for Interested Party, the ROE in Stratus 1782 proceeding (with Eric Bloom) (Dist. of CO.)***<br><br>T: 415-591-1000<br>dbloch@winston.com |
| William H. Narwold<br>Ingrid L. Moll<br>Matthew P. Jasinski<br>Motley Rice, LLC<br>One Corporate Center<br>20 Church Street, 17th Floor<br>Hartford, CT 06103<br>imoll@motleyrice.com | ***Counsel for Plaintiffs in the Yaiguaje Litigation***<br><br>T: 800-768-4026<br>bnarwold@motleyrice.com<br>imoll@motleyrice.com<br>mjasinski@motleyrice.com |

                     /s/ Claudia M. Barrett
                     Claudia M. Barrett